**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| CASHMAN EQUIPMENT CORP. | * | CIVIL ACTION NO.: 11-00329 |
| | * | |
| VERSUS | * | JUDGE SHELLY D. DICK |
| | * | |
| INLAND MARINE SERVICES, LLC | * | MAG. RIEDLINGER |

## RULING

Before the Court is Inland Marine Services, LLC's *Motion for Summary Judgment*[1] as to Cashman Equipment Corporation's claims. Cashman has filed a *Memorandum in Opposition*[2] to which Inland has filed a *Reply*[3]. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1333. For the following reasons, Inland's *Motion* is granted in part and denied in part.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

In August of 2009, Inland chartered the use of Cashman's dredge, consisting of a barge—the JMC 5—and its crane—a Manitowoc 4600.[4] The First Charter lasted for approximately one month, and the terms were formalized by two legal instruments: a Barge Bareboat Charter and an Equipment Lease Agreement.[5] The following June, the parties entered into a Second Charter subject to a similar contractual agreement;[6] however, this time, the charter ended under much less amicable circumstances.

---

[1] Rec. Doc. 33.
[2] Rec. Doc. 39.
[3] Rec. Doc. 42.
[4] Rec. Doc. 1, p. 2.
[5] Rec. Doc. 1, pp. 2-3; Rec. Doc. 33-1, p. 5; Rec. Doc. 39-2, p. 2. The dredge went off-hire on August 23, 2009. Rec. Doc. 33-4. The parties entered the Barge Bareboat Charter and Equipment Lease Agreement on August 12, 2009. The Equipment Lease Agreement provided that the rental period for the equipment would begin on August 13, 2009. Rec. Doc. 33-4, p. 1.
[6] Rec. Doc. 33-1, p. 12; Rec. Doc. 39-2, p. 5. The dredge went on-hire on June 8, 2010.

Approximately two months into the second charter, Cashman reclaimed its dredge from Inland and terminated the Second Charter for alleged non-payment of the charter hire.[7] Unable to work through this impasse, Cashman filed this maritime lawsuit on May 17, 2011, asserting breach of contract claims.

Cashman seeks to recover unpaid repair costs for its equipment as a result of Inland's neglect, inaction, and negligence during the First and Second Charters, as well as unpaid charter hire costs arising out of the Second Charter.[8] As to those repair costs arising out of the First Charter, Inland was not informed of such invoices until Cashman filed the pending lawsuit.[9] Nevertheless, Cashman now seeks to recover for labor and equipment costs arising out the First Charter to gas free the generator room (invoice 500482),[10] for the removal and replacement of generators on the JMC 5 (invoices 21706, 271163, 280008, and 33126),[11] to replace the potable water pump (invoice 143437),[12] and "to get [the] barge ready for job" and "to get [the] barge ready to go out to [Inland]" (invoices 12548, 12535, and 1651).[13] As for the Second Charter, Cashman contends that Inland caused damage to its crane and seeks recovery for costs associated with Mike Evans Crane Services, LLC's invoices 895, 962, and 959.[14]

---

[7] Rec. Doc. 33-1, p. 16; Rec. Doc. 39-2, p. 7. Cashman terminated the second charter and retook possession of the dredge on or about September 28, 2010. The dredge went off-hire on the same date.

[8] Rec. Doc. 33-1, p. 2; Rec. Doc. 39-2, p. 1. Specifically, the invoices are for the following: 21706 (exchanging two generator specs and two core engines); 271163 (cutting inserts to remove generator); 280008 (installation of deck cut out); 21761 (installation of 6-71 generator engine); and 33126 (deck cut out). Rec. Doc. 33-1, pp. 6-7; Rec. Doc. 39-2, p. 3.

[9] Rec. Doc. 33-1, p. 11; Rec. Doc. 39-2, p. 5.

[10] Rec. Doc. 33-1, p. 6; Rec. Doc. 39-2, p. 2.

[11] Rec. Doc. 33-1, p. 8; Rec. Doc. 39-2, p. 3.

[12] Rec. Doc. 33-1, pp. 8-9; Rec. Doc. 39-2, p. 3.

[13] Rec. Doc. 33-1, pp. 9-10; Rec. Doc. 39-2, p. 4.

[14] Rec. Doc. 33-1, p. 14; Rec. Doc. 39-2, p. 6. Cashman specifically "[a]dmitted that MECS performed some services to the JMC 5 and purported to bill for those services in the referenced invoices".

In response to Cashman's claims and demands, Inland filed an *Answer, Affirmative Defenses, and Counterclaim.*[15] In its counterclaim, Inland alleges claims of breach of warranty asserting that Cashman knew or should have known that the leased equipment had latent defects rendering it unseaworthy and unable to be used for its intended purpose. Moreover, Inland contends it was unaware of the latent defects. Inland seeks to recover monetary expenses for lost revenue due to its inability to use the leased equipment and for additional costs and expenses it incurred to obtain a replacement dredge to meet its contractual obligations with third parties.

Upon the completion of fact discovery, Inland filed the pending *Motion* in which it contends that there are no genuine issues of material fact as to Cashman's claims for First and Second Charter repair costs and unpaid charter hire.

## II.     LAW

### A.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16] "When assessing whether a dispute to any material fact exists, we consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[17] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[18] If the moving party satisfies its

---

[15] Rec. Doc. 7.
[16] Fed.R.Civ.P. 56(a).
[17] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, at 398-99 (5th Cir. 2008).
[18] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, at 494 (5th Cir. 2003)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, at 323-25, 106 S.Ct. at 2552)).

burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[19]  However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[20]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[21]  All reasonable factual inferences are drawn in favor of the nonmoving party.[22]  However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[23]  "Conclusory allegations unsupported by specific facts … will not prevent the award of summary judgment; 'the plaintiff [can] not rest on his allegations … to get to a jury without any "significant probative evidence tending to support the complaint.""[24]

### B.  Rule 56(d) of the Federal Rules of Civil Procedure—Facts Unavailable

In its opposition memorandum, Cashman seeks relief under Rule 56(d) of the Federal Rules of Civil Procedure due to the unavailability of certain sworn testimony from Cashman's employee, Durrel "Skip" Broussard (Broussard), and witness Mike Evans (Evans).  On December 9, 2013, this Court granted Cashman's motion to

---

[19] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, at 247 (5th Cir. 2003)(quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[20] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, at 315 (5th Cir. 1995)(quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[21] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[22] *Galindo v. Precision American Corp.*, 754 F.2d 1212, at 1216 (5th Cir. 1985).
[23] *RSR Corp. v. International Ins. Co.*, 612 F.3d 851, at 857 (5th Cir. 2010).

substitute the executed affidavit of Broussard for the unexecuted affidavit attached to the opposition memorandum; therefore, the Rule 56(d) motion is now moot as to this particular issue. The only remaining issue is whether the Court should defer ruling on the instant motion to allow Cashman the opportunity to depose Evans.

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." The Fifth Circuit has explained that in order to obtain additional discovery under Rule 56(d), a party "must show (1) why [it] needs additional discovery and (2) how that discovery will create a genuine issue of material fact."[25] However, "if the litigants have 'not diligently pursued discovery,... [they are] not entitled to relief' under Rule 56(d)."[26]

Cashman contends that it should be able to depose Evans because the "circumstances that led to his 'unavailability' create the appearance that Inland and/or Mr. Evans provided or procured his testimony voluntarily to Inland while simultaneously impeding Cashman's ability to do the same."[27] Cashman argues that seven days prior to the discovery deadline, Inland canceled Evans' deposition. When Cashman attempted to reschedule the deposition, Evans claimed to be unavailable at any date prior to the discovery deadline; Cashman contends that this lack of availability was driven by a separate, ongoing lawsuit between Cashman and Evans. Inland opposes

---

[24] *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, at 713 (5th Cir. 1994)(quoting *Anderson*, 477 U.S. at 249).
[25] *Beattie v. Madison County School Dist.*, 254 F.3d 595, at 606 (5th Cir. 2001).
[26] *Guidry v. Georgia Gulf Lake Charles, L.L.C.*, 479 Fed.Appx. 642, at 644 (5th Cir. 2012)(quoting *Beattie v. Madison County School Dist.*, 254 F.3d 595, 606 (5th Cir. 2001).
[27] Rec. Doc. 39, p. 2.

Cashman's request and provides evidentiary support for its position. Email documents attached to Inland's reply memorandum show that counsel for Inland informed counsel for Cashman five days in advance of the unnoticed deposition that it would not be deposing Evans.[28] Email correspondence also shows that on October 24, 2013, Inland agreed to a joint motion to extend all deadlines, after learning from Cashman about Evans' inability to be deposed until after the discovery deadline had lapsed.[29] Cashman, however, never filed such a motion. Therefore, without an extension of the established discovery and dispositive motion filing deadlines, Inland timely filed the pending summary judgment motion.

As previously explained, the burden rests on the movant in a Rule 56(d) motion to explain why the additional discovery time is necessary and how it will create a genuine issue of fact. Notably, however, this burden will not be satisfied if a party has not been diligent is seeking such discovery. The Court finds that Cashman's failure to timely file an unopposed or joint motion to extend all deadlines, including the discovery deadlines, exposes Cashman's lack of diligence in seeking discovery from Evans. Accordingly, the Court will not defer ruling on Inland's summary judgment motion, and Cashman's Rule 56(d) motion shall be denied as to Evans.

## III.    ANALYSIS

### A.    Contractual Language as to Invoices for Repairs

In its *Complaint*[30], Cashman alleges that the First and Second Charters were "formalized by the execution of two contracts, a Barge Bareboat Charter for use of the JMC 5, and an Equipment Lease Agreement." On August 12, 2009, the parties entered

---

[28] Rec. Doc. 42-1, p. 2.
[29] Rec. Doc. 42-2, pp. 2-3.

the Equipment Lease Agreement (Equipment Lease) and Barge Bareboat Charter (Bareboat Charter) for the First Charter, with the rental period and charter hire beginning on August 13, 2009.[31]  As for the Second Charter, the parties entered into the agreements on June 4, 2010; however, the rental period and charter hire did not begin until June 8, 2010.[32]

The Bareboat Charter explicitly covered the agreement between Cashman and Inland for the use or hire of the bareboat barge or JMC 5 (Vessel).[33]  Two sections stand out as emphasizing the need for the JMC 5 to be returned in the same condition upon the termination of the charter, minus ordinary wear and tear.  Section 4 states that

> The Vessel shall be picked up at [CASHMAN'S] yard … Upon termination, the Vessel shall be delivered to [CASHMAN]  in like good order and condition as when received ordinary wear and tear excepted, at [CASHMAN'S] yard … and the Charter Hire shall continue until such redelivery.  If on return of the Vessel, CASHMAN is put to any expense of repairs of the hull, superstructure, electrical circuitry or air conditioning, fuel supply, water supply and sewage disposal system of the Vessel or cleaning of the Vessel to put it in the same good, seaworthy and clean condition as upon delivery, [INLAND] agrees to reimburse [CASHMAN] for said expense and to pay charter hire until date barge is returned to same good, seaworthy and clean condition.[34]

Similarly, Section 8 of the Bareboat Charter provides:

> [INLAND] agrees to maintain the Vessel in a good and seaworthy condition during the term of this charter and will redeliver the Vessel to [CASHMAN] in the same good and seaworthy condition as when the Vessel was received, ordinary wear and tear excepted.
>
> a) [CASHMAN] shall cause, at [INLAND'S] cost, an on-charter survey to be conducted prior to possession of the Vessel by [INLAND], and an off-charter survey to be conducted at the termination of the charter at the time

---

[30] Rec. Doc. 1.

[31] Rec. Doc. 33-4, pp. 65, 68-69, and 72.

[32] Rec. Doc. 33-4, pp. 92, 95, and 98.

[33] April 13, 2009.  Rec. Doc. 33-4, p. 69; Rec. Doc. 39-1, p. 9; .  ("OWNER hereby agrees to bareboat charter to CHARTERER, and CHARTERER agrees to hire bareboat, barge known as JMC 5 (hereinafter 'the Vessel').").

[34] Rec. Doc. 33-4, p. 69; Rec. Doc. 39-1, p. 9.

of physical redelivery of the Vessel to [CASHMAN]. It is agreed by both parties that the said survey shall be conclusive proof as to the damage, if any, sustained by the Vessel during the time of this charter. [INLAND] to remove all weldments flush to deck and paint such areas to [CASHMAN's] satisfaction.

b) In the event of damage greater than wear and tear is noted by the survey, then it shall be [INLAND's] duty to: (i) repair the Vessel or cause the Vessel to be repaired at its own cost; and (ii) pay the Charter Hire until the Vessel is either repaired to [CASHMAN's] satisfaction or is placed back into charter service by [CASHMAN]. Failure to comply with the requirements of subclause (i) of this paragraph within five (5) days of notification required repairs will authorize [CASHMAN] to perform said repairs or cause the repairs of the Vessel to be made as [INLAND's] agent and to recover the full cost of same from [INLAND].

c) The cost of said repairs shall be payable by [INLAND] immediately upon presentation to it of the repair invoice.

d) In the event [CASHMAN] performs repairs or caused repairs to be performed by others on the Vessel, then [INLAND] shall be conclusively bound by the amount of said repair invoice and waives its right to contest the reasonableness of the amount thereof.

e) It is further understood and agreed that in the event damage is noted as per this numbered paragraph, then physical redelivery of the Vessel by [INLAND] shall not constitute acceptance of the Vessel by [CASHMAN] nor a release or termination of [INLAND's] obligation hereunder to repair the damage and pay Charter Hire…[35]

As for the Equipment Lease, it was to be read in conjunction with the Bareboat Charter.[36] Under both charters, the only equipment listed as being subject to the Equipment Lease between the parties was the crane (Manitowoc 4600). Additionally, the Equipment Lease constituted the full agreement between the parties and it could only be modified in writing and signed by the parties executing the agreement.[37]

---

[35] Rec. Doc. 33-4, p. 70; Rec. Doc. 39-1, p. 10.
[36] Rec. Doc. 33-4, p. 68; Rec. Doc. 39-1, p. 16.
[37] Rec. Doc. 33-4, p. 68; Rec. Doc. 39-1, p. 16.

Section 12 of the Equipment Lease required an inspection of the crane prior to Inland taking possession of it "to establish the condition of the equipment at the beginning of the lease period."[38]  A second inspection was also required "[a]t the termination of the lease period … to determine the condition of the leased equipment … to determine if the equipment has sustained any damage during the lease period."[39] According to the language of the Equipment Lease, this was to ensure that the crane was returned to Cashman "in as good a condition as it was originally provided to [Inland]."[40]

Section 8 of the Equipment Lease set forth the maintenance and operation requirements for the equipment, providing as follows:

> [INLAND] shall see that the Equipment is used in a reasonable and responsible fashion and shall never subject the equipment to careless or needless rough usage.  [INLAND] shall at all times insure that that the personnel employed to operate and maintain the equipment are competent, experienced and properly licensed personnel … Responsibility to maintain the equipment shall at all times be exclusively with [INLAND] at all times during the Rental Period.  [INLAND] shall at its own expense maintain the Equipment in good operating condition, well-greased, oiled, cleaned and repaired and in such condition shall return it to [CASHMAN] absent reasonable wear and tear.  [INLAND] shall promptly inform [CASHMAN] of any damage to the Equipment including normal wear and tear.  If [CASHMAN] observes a condition which, if allowed to continue unabated, would lead to serious damage, [INLAND], must provide immediate corrective action to remedy that situation.  The cost of all repairs (parts and labor) will be borne solely by [INLAND].  In the event the Equipment is rendered not serviceable or otherwise damaged during the Rental Period, the obligation of [INLAND] to pay the stated rental rate shall continue to accrue until the Equipment is restored to its original condition at the inception of the lease (but excluding normal wear and tear).[41]

---

[38] Rec. Doc. 33-4, p. 67; Rec. Doc. 39-1, p. 15.
[39] Rec. Doc. 33-4, p. 67; Rec. Doc. 39-1, p. 15.
[40] Rec. Doc. 33-4, p. 67; Rec. Doc. 39-1, p. 15.
[41] Rec. Doc. 33-4, p. 66; Rec Doc. 39-1, p. 14.

The parties agree that pursuant to the Bareboat Charter an on-charter survey and an off-charter survey was conducted for both charters to "objectively determine whether any damages to the hull of the JMC 5 had occurred during the charter for which [Inland] would be responsible."[42]  The surveys of the hull were performed by Bachrach & Wood (B&W).[43]  The parties also agree that on-charter and off-charter surveys of the crane were performed for both the charters by Mike Evans Crane Services, LLC (MECS).[44]  Both B&W and MECS were companies that Cashman typically engaged to inspect and repair its equipment.[45]

**B.    First Charter Invoices**

1.    Coral Marine 500482 Invoice -- Gas Freeing

Inland seeks summary judgment as to Cashman's claim for reimbursement of payments it made to Coral Marine for services to gas free the generator room of the JMC 5, as reflected in Invoice 500482.[46]  These services were rendered in between the First and Second Charter on May 28, 2010 and total $3,200.00.  During the corporate deposition of Cashman, it was acknowledged that Invoice 500482 would be attributed to the First Charter.  The B&W off-charter survey of the steel spud/crane barge for the JMC 5 specifically notes that "[a]s a result of on charter no new damage was found."[47]  According to B&W's survey report, "[a]t the time of the off charter, subject vessel was found to be in essentially the same condition as existed at the time of the on charter,

---

[42] Rec. Doc. 33-1, p. 3; Rec. Doc. 39-2, p. 2.

[43] Rec. Doc. 33-1, p. 3; Rec. Doc. 39-2, p. 2.

[44] Rec. Doc. 33-1, pp. 3-4; Rec. Doc. 39-2, p. 2.

[45] Rec. Doc. 33-1, p. 3; Rec. Doc. 39-2, p. 2.

[46] Rec. Doc. 33-4, pp. 120-21; 124.  Cashman is seeking to recover those costs that it paid to Coral Marine Service who performed the services.

[47] Rec. Doc. 33-4, p. 79.

with no noted exceptions."[48] Similarly, the on-charter and off-charter inspections conducted by MECS reflected no change in the crane. According to Stephen Loupe, member and manager of Inland, Cashman never invoiced or sought back-charges from Inland for any repairs in connection with the First Charter.[49]

In its opposition memorandum, Cashman contends that Inman has overlooked the fact that the JMC 5 consisted of three component parts—the crane, the hull, and the living quarters—all of which were subject to evaluations. Cashman asserts that Inland, a sophisticated charterer, "was aware the scope of these surveys was limited by component and referred to the survey reports with the requisite level of specificity," which is reflected in an email communication from Inland to Cashman which states: "The date of Off Charter on the JMC-5 is Saturday, February 14th. Both the crane and hull surveys were completed this date."[50] Therefore, Cashman argues that because the on-charter and off-charter surveys performed by B&W and MERC are incomplete, they cannot be relied upon to support a summary judgment motion as to those charges related to the component parts of the living quarters arising out of the First Charter, such as gas freeing, generator replacement, and the replacement of the potable water pump.

Cashman further claims that gas freeing is a "service" and not a repair, and is "not a physical condition that is ever documented or called out in a 'condition' survey;" therefore, "these services are not within the scope of the surveys upon which Inland relies."[51] In support of its position, Cashman relies on Broussard's attestation that gas

---

[48] Rec. Doc. 33-4, pp. 80-81.
[49] Rec. Doc. 33-3, p. 3.
[50] Rec. Doc. 39-1, p. 53.
[51] Rec. Doc. 39, p. 12.

freeing is not a physical condition identified in a condition survey and within the industry, "survey reports do not mention [] gas freeing. Gas freeing is unrelated to the 'condition of the barge' or 'damage to the barge.'"[52] Cashman further submits unsubstantiated argument that Inland should be responsible for these charges for two reasons: (1) when Inland acquired the JMC 5 it did not require gas freeing, but upon the JMC 5's return after the First Charter, gas freeing was required; and (2) Inland's use of the JMC 5 is what prompted the need for gas freeing. Aside from these conclusory statements, Cashman offers no additional evidentiary support for its position.

The Court finds that Cashman has failed to identify specific evidence in the record that supports its claim that Inland owes payment for gas freeing. According to the off-hire surveys performed at the conclusion of the First Charter, it is clear that there was no documented damage attributed to Inland. Nevertheless, even when the Court takes into account Cashman's contention that the on-hire and off-hire inspection surveys would not reflect whether services such as gas freeing was required, the Court cannot overlook the simple fact that Cashman has failed to provide any evidentiary support in support of its assertions that such a service was, in fact, necessary after Inland's use of the JMC 5, or how Inland's use of the JMC 5 prompted the need for gas freeing. "[U]nsubstantiated assertions are not competent summary judgment evidence."[53] Furthermore, Broussard's generalizations about the purpose of gas freeing fail to shed any light on why such a service was necessary at the close of Inland's First Charter with Cashman. Accordingly, the Court finds that Inland is entitled to summary judgment as to the Coral Marine Invoice 500482 for gas freeing.

---

[52] Rec. Doc. 43-2, p. 2.
[53] *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

## 2. Generator Invoices 21706, 271163, 280008, 21761, and 33126

Cashman seeks reimbursement from Inland for repairs made to and for the replacement of the generators on the JMC 5 as reflected in Invoices 21706, 271163, 280008, 21761, and 33126. The parties do not dispute that services or repairs to the generators were rendered on various dates between May 31, 2010 and June 9, 2010.[54] It is also undisputed that Cashman is seeking reimbursement for a total amount of $7,999.23.[55]

Inland relies heavily on the testimony of Broussard to support its summary judgment motion as to the generator invoices. Broussard testified that the off-charter surveys for the First Charter made no mention of any damage to the generators, and that to his knowledge no documentation existed that would capture the condition of the generator during the off-hire inspection.[56] Importantly, Broussard testified that he conducted the inspection of the generators when he was working with Inland to determine if they were operational.[57] According to Broussard, if the generators were operational when they came off-charter, there would not be any issue.[58] In this case, Broussard testified that, when Inland returned the JMC 5 after the First Charter, he made no notations that would indicate that the generators were not operational.[59]

---

[54] Rec. Doc. 33-1, pp. 6-8. Invoice 21706 was issued by Diesel Source, Inc. to Cashman for services rendered on May 31, 2010; Invoice 271163 was issued by Michael Coon to Cashman for services rendered on June 1, 2010; Invoice 280008 was issued by Shawn Priestly to Cashman on June 7, 2010; Invoice 21761 was issued by Diesel Source, Inc. to Cashman for services rendered on June 9, 2010; and Invoice 33126 was issued by Shawn Priestly to Cashman for services rendered on May 31, 2010.

[55] Rec. Doc. 33-1, pp. 6-8. Cashman backcharged Inland as follows: $14,000 for Invoice 21706; $166.25 to Inland on Invoice 271163; $341.25 for Invoice 280008; $3,246.48 for Invoice 21761; $166.25 for Invoice 33126.

[56] Rec. Doc. 33-5, p. 5.

[57] Rec. Doc. 33-5, p. 5.

[58] Rec. Doc. 33-5, p. 6.

[59] Rec. Doc. 33-5, p. 6. When asked, "[y]ou did not note that the generators were ever not operations when they came back from being chartered by Inland," Broussard answered "[t]hat's correct."

Broussard also testified that it was his understanding that a Cashman employee had actually lived on-board the JMC 5 for a week or two in between the First and Second Charters.[60]  He further testified that this employee was "probably running a generator and freshwater pump."  Notably, Broussard could not determine whether the repairs took place before or after the employee resided on the JMC 5.

In opposition, Cashman reasserts its argument that none of the survey reports relied upon by Inland pertain to damages and/or repairs to the living quarters, where the generators were located; therefore, there would be no inspection of the generators within such surveys.  Relying on this premise, Cashman argues that Inland has simply established that the crane and hull inspectors never examined the generators.

The Court finds that Cashman has once again failed to provide some evidence creating a genuine issue of material fact as to Inland's responsibility for these repairs.  While all inferences must be viewed in a light most favorable to the non-movant, the non-movant here, Cashman, has offered not one scintilla of evidence upon which it is making its claim for reimbursement for these generator costs.  Cashman has offered no evidence (e.g., documentation noting defects in generators) to show that these repairs were necessary and caused by Inland's use.  Even if these off-survey inspections do not assess damages to the so-called living areas, Cashman has offered nothing in response justifying these expenditures.  Without more, no reasonable juror could find in Cashman's favor.  Accordingly, the Court finds that Inland is entitled to summary judgment as to the generator invoices 21706, 271163, 280008, 21761, and 33126.

---

[60] Rec. Doc. 33-5, pp. 10-11.

### 3.    Potable Water Pump Invoice 143437

Inland seeks summary judgment as to Cashman's Invoice 143437 in the amount of $499.40 for the replacement of a potable water pump.  These services were rendered by Power Specialties, Inc., on or about June 8, 2010.[61]   Reiterating its earlier arguments, Cashman contends that, because the water pump is a component of the living quarters, it was beyond the scope of the off-charter survey reports relied upon by Inland and, therefore, summary judgment is inappropriate.   Again, the Court is well-aware of its responsibility to consider all inferences in a light most favorable to the non-movant; however, there is also a responsibility placed upon the non-movant in summary judgment motions.   Specifically, Cashman has the burden to set forth specific facts showing the existence of a genuine issue of material fact.  In this case, Cashman has offered no evidence showing why the potable water pump needed to be replaced and, more importantly, how Inland bears any responsibility for this repair.   The Court finds that Cashman has simply failed to satisfy its burden and that Inland is entitled to summary judgment as to Invoice 143437 for the replacement of the potable water pump.

### 4.    Preparatory Work Invoices 12548, 12535, and 1651[62]

Cashman seeks reimbursement from Inland for expenditures made to Ashland Services and Cashman Scrap & Salvage to perform various services and labor in late May and early June of 2010.[63]   According to Cashman's corporate representative's testimony, these repairs were necessary because the barge needed to be cleaned and

---

[61] Rec. Doc. 33-1, pp. 8-9; Rec. Doc. 39-2, p. 3.
[62] Cashman contends Invoice 1651 is really factually attributable to generator cost.
[63] Rec. Doc. 33-4, pp. 47; 59.

prepared to go onto the job, or the Second Charter.[64]  For instance, Invoice 12548 in the amount of $702.00 was paid to Ashland Services to get the barge ready to go on charter to Inland.[65]  Invoice 12535 was paid for cleaning the downstairs area in the barge after the welders completed replacing the generators.[66]  Cashman charged Inman half of the total invoice, or $495.00.[67]  Inland contends that summary judgment is appropriate on these "preparatory" charges.

As for Invoice 1651, Cashman contends that this payment totaling $4,457.50 was paid to Cashman Scrap & Salvage to remove generators from the barge and clean-up associated therewith and was mischaracterized as preparatory work.[68]  The Court agrees with Cashman's position.  Nevertheless, the Court finds, for those reasons discussed above, that Inland should prevail on Cashman's claim for generator repairs/replacement costs associated with Invoice 1651.[69]

As for Invoices 12548 and 12535, Cashman could not identify which charter these costs were attributed to during deposition testimony.[70]  As to the First Charter, Cashman admitted that the off-charter surveys mentioned nothing about the need for any such housekeeping upon the return of the JMC 5.[71]  Additionally, the Court finds that, while Section 4 of the Bareboat Charter allows for recovery of costs for cleaning in order to "put it in the same good, seaworthy and clean condition as upon delivery",

---

[64] Rec. Doc. 33-4, p. 48.
[65] Rec. Doc. 33-4, p. 47; Rec. Doc. 33-4, p. 155 specifically states, "labor to get the barge ready to out to Inland Marine."
[66] Rec. Doc. 33-4, pp. 58-59; Rec. Doc. 33-4, p. 167 specifically states, "labor to get the barge ready for job."  See also, Rec. Doc. 33-4, p. 169.
[67] Rec. Doc. 33-4, p. 64.
[68] Rec. Doc. 33-4, p. 60.
[69] Cashman only seeks to recover half of the total invoice amount; in other words, Cashman is seeking to recoup $2,228.75.  Rec. Doc. 33-1, pp. 9-10; Rec. Doc. 39-2, p. 4.
[70] Rec. Doc. 33-4, pp. 58-59, and 61.
[71] Rec. Doc. 33-4, p. 51.

Cashman has offered no evidence showing that such cleaning was necessary at the termination of the First Charter or attributable to Inland.

To the extent these charges could be attributed to the Second Charter, Cashman explained that these repairs were necessary because the "barge needed to be cleaned and prepared to go on the job."[72] When pressed further, Cashman's corporate deponent acknowledged that charterers are not typically charged for preparatory work; rather, they are only charged if Cashman is "preparing it specifically for that [charterer's] project."[73] Cashman could not identify any specific purpose of Inland's Second Charter which would have required the work contained in these preparatory invoices.[74] Additionally, Cashman's corporate deponent admitted that there was no contractual authority—neither in the Equipment Lease nor the Bareboat Charter—that required Inland to be responsible for Cashman's cleaning of the barge.[75] Moreover, Cashman admitted that, in between the charters, Cashman employees were staying on the barge.[76] According to Broussard, it was his understanding that a Cashman employee had resided on the JMC 5 for one to two weeks and was using it as living quarters.[77]

In its opposition, Cashman addresses only one of the invoices—invoice 12548—but offers no evidentiary support to create a genuine issue of material fact.[78] Cashman contends that, because the JMC 5 was not chartered to anyone else in between the two charters, "[i]t is irrelevant whether labor is classified as being necessary as a result of

___

[72] Rec. Doc. 33-4, p. 48-49.
[73] Rec. Doc. 33-4, p. 49.
[74] Rec. Doc. 33-4, p. 50.
[75] Rec. Doc. 33-4, p. 50.
[76] Rec. Doc. 33-4, pp. 53-54. Cashman admitted in its own Response to Statement of Uncontested Facts that invoice 12535 was issued for services rendered, more specifically, for labor to get barge ready for job." Rec. Doc. 33-1, p. 9; Rec. Doc. 39-2, p. 4.
[77] Rec. Doc. 33-5, pp. 10-11

Charter no. 1 or 'in preparation' for Charter no. 2," and that "[i]f the services reflected in invoice 12548 were to remedy conditions caused by Inland during Charter no. 1, then Inland is properly responsible for those charges."[79]   Cashman offers no additional evidence to support its position.

The Court finds that Cashman's argument as to invoice 12548 "does not rise above the level of mere speculation and conjecture" and is, therefore, insufficient to defeat summary judgment.[80]   Cashman fails, yet again, to produce any evidence showing that these costs, or those costs sought in Invoice 12535, were necessary after Inland's use of the JMC 5, or were necessary for Inland's specific purpose under the Second Charter.   Accordingly, Inland's motion shall be granted as to Invoices 12548 and 12535.

### C.   Second Charter Issues Invoices

#### 1.   Is Inland responsible for Invoices 895, 962, and 959?

Inland contends that the undisputed evidence shows that it is not responsible for the invoices[81] related to repairs to house rollers, bearings, and the crane performed during the Second Charter, because these repairs are attributable to Cashman's refusal to perform suggested maintenance and to properly make certain repairs prior to the Second Charter.   Inland further argues that, unbeknownst to it, these substantial repairs existed at the commencement of the Second Charter and could not have resulted from Inland's use of the JMC 5.

---

[79] Rec. Doc. 39, p. 14.

[80] *Kelly v. Labouisse*, 364 Fed. Appx. 895, at 897 (5th Cir. 2010).

[81] Invoices 895, 962, and 959.   Rec. Doc. 33-4, p. 29 (Invoice 895 was billed for parts to repair the rollers on the crane on the turntable, the house rollers and bearings, and air valve); Rec. Doc. 33-4, p. 31 (Invoice 962 was billed for labor to repair bucket for crane while the crane was on charter); Rec. Doc. 33-4, p. 193 (Invoice 959 for labor and material to replace the roller path bolts).

Prior to the Second Charter, Inland admits that a visual inspection of the crane and hull was performed and there were no apparent defects to either that had not already been identified by Evans or B&W in their respective inspection reports and/or surveys.[82] According to Inland, from June 8, 2010 through June 26, 2010, the crane on the JMC 5 was only operated by experienced and skilled operators within the functional ability and operational limits of the crane.[83] However, on June 26, 2010, the bearings on the house rollers went out and MECS was called out to perform repairs which lasted approximately 22 days. Thereafter, the crane broke down again and required additional repairs.[84] In total, the crane was down for repairs for approximately 29 days.

At some point before the start of the parties' second charter, Evans was contacted by Cashman to inspect the JMC 5. In his affidavit Evans states that, as a result of his inspection, he determined that the front and rear rollers needed to be replaced, that new bolts be used and re-torqued, that the house roller pads be re-welded, and that the ring be welded down.[85] Evans based his recommendation on his "experience that the nature of the repair was such that, if left untreated, it would result in further damage to the house rollers in the near future."[86] In spite of his suggestion, Evans attests that Cashman only authorized him to replace the rear house rollers and to re-torque the old bolts. According to Evans, Cashman said they would weld the ring down.

---

[82] Rec. Doc. 33-3, p. 3.
[83] Rec. Doc. 33-3, p. 4.
[84] Steven Loupe testified that the crane broke down again after an hour of Inland's attempt to resume dredging. Rec. Doc. 33-3, p. 4.
[85] Rec. Doc. 33-6, p. 2.
[86] Rec. Doc. 33-6, p. 2.

In response, Cashman offers the testimony of Broussard who oversaw the repairs to the JMC 5, including the replacement of the ring, the rear house rollers, and the re-torquing and replacement of ring bolts.[87] According to Broussard, he disagreed with Evans' opinion about the need to replace the front house rollers based on his own inspection, and he felt that Evans' suggested repair method of welding down the crane was improper.[88] Broussard contends that he oversaw the replacement of the ring bolts and that Evans' statements to the contrary are wrong.[89]

The Court finds that, based on the conflicting evidence about whether certain repairs were, in fact, necessary and whether certain repairs were performed appropriately, there is a genuine issue of material fact in dispute as to causation of damage to the house rollers and the crane. Accordingly, it would be improper for the Court to grant summary judgment as to the three invoices relating to repair of the JMC 5's house rollers and crane at this juncture. Therefore, Inland's motion for summary judgment shall be denied as to this issue.

### 2. Inland's failure to pay charter hire during Second Charter

It is undisputed that Inland failed to pay the charter hire owed to Cashman for the period of time during the Second Charter.[90] In fact, Inland admits that it withheld charter hire payment totaling $102,877.69.[91] As a result of Inland's failure to pay, Cashman terminated the Second Charter and seized possession of the JMC 5.[92] The JMC 5 went off hire on September 28, 2010.[93]

---

[87] Rec. Doc. 43-2, p. 2.
[88] Rec. Doc. 43-2, p.3.
[89] Rec. Doc. 43-2, p.3.
[90] Rec. Doc. 33-1, p. 16; Rec. Doc. 39-2, p. 7.
[91] Rec. Doc. 33-1, p. 16; Rec. Doc. 33-3, p. 4.
[92] Rec. Doc. 33-1, p. 16; Rec. Doc. 30-2, p. 7.
[93] Rec. Doc. 33-1, p. 16; Rec. Doc. 39-2, p. 7.

Inland contends that it failed to pay the charter hire only for those time periods when the JMC 5 was inoperable resulting from Cashman's breach of warranty and failure to provide a dredge in good condition suitable for the purposes it was leased.[94] Inland further argues that, unbeknownst to it, the JMC 5 needed repairs to the house rollers at the commencement of the Second Charter which could not be attributed to Inland's use.[95] Under these circumstances, Inland argues that Cashman cannot rely on the contractual waivers. This argument, however, rests in part, upon a finding that Cashman's decision not to make certain repairs and how it elected to make such repairs caused damage to the house rollers and crane.[96] Based on the Court's prior finding that there is a genuine issue of material fact as to what caused the disrepair of the house rollers and crane, based on the evidence supplied by the parties, the Court will look to the plain language of the contract entered by the parties for guidance on the issue of charter hire.

Section 3 of the Bareboat Charter sets forth the Charter Hire of $1,500.00 per day for the use or hire of the JMC 5.[97]

Additionally, Section 7(a) of the Equipment Lease between the parties for the Second Charter provides as follows:

> Monthly Rental Rates shall not be subject to any deductions on account of any non-working time in the month but the amount of the rent payable for any fraction of a month, after the Minimum Rental Period specified, will be at the rate of 1/30th of the monthly rate for each calendar day.[98]

---

[94] Rec. Doc. 33-7, p. 15. Inland contends that Cashman breached its obligation to deliver the dredge "in good condition suitable for the purpose for which it was leased" under Louisiana law. (La. C.C. art. 2684). Inland further contends that pursuant to articles 2696 and 2697, Cashman warranted that the dredge was free from unknown and known vices and defects.
[95] Rec. Doc. 33-7, p. 15.
[96] As to the breach of warranty, this will go more toward what Cashman and Inland were each aware of regarding the condition of the barge prior to the Second Charter.
[97] Rec. Doc. 33-4, p. 69; Rec. Doc. 39-1, p. 9.
[98] Rec. Doc. 33-4, p. 92; Rec. Doc. 39-1, p. 13.

The Court finds that the plain language of the contract could not be any clearer. Inland was not permitted to take any deductions from its monthly rental rates for any non-working time. Until the issue of causation is resolved as to the Second Charter, the plain language of the contract controls. Accordingly, the Court denies summary judgment as to Inland's failure to pay the charter hires for the Second Charter.

## IV.    CONCLUSION

Accordingly, Inland Marine Services, LLC's *Motion for Summary Judgment*[99] is hereby GRANTED as to First Charter Invoices 500482 (gas freeing); 21706, 271163, 280008, 21761, 33126, and 1651 (collectively for generators); 143437 (replacement of potable water pump); and 12548 and 12535 (collectively for cleaning and preparation of barge). Inland's *Motion for Summary Judgment*[100] is hereby DENIED as to the Second Charter Invoices 895, 962, and 959, and as to the Second Charter's unpaid charter hire.[101]

It is further ordered, that Cashman's request for relief under Rule 56(d) of the Federal Rules of Civil Procedure is hereby DENIED.[102]

Signed in Baton Rouge, Louisiana, on <u>May 30, 2014</u>.


_____
**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[99] Rec. Doc. 33.
[100] Rec. Doc. 33.
[101] Rec. Doc. 33.
[102] Rec. Doc. 39.